# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 10-55V
Filed: April 19, 2019
To be Published

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SHINGSHAN LIU and SUE WANG LIU, as Personal Representatives of the Estate of DAN LIU, Deceased, <br><br> Petitioners, <br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br> Respondent. | Attorneys' fees and costs decision; <u>Perreira</u>; reasonable basis lost during proceedings |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>F. John Caldwell, Jr.</u>, Sarasota, FL, for petitioners.
<u>Althea W. Davis</u>, Washington, DC, for respondent.

**MILLMAN, Special Master**

### DECISION AWARDING PARTIAL ATTORNEYS' FEES AND COSTS[1]

On January 27, 2010, petitioners filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10–34 (2012), alleging that Menactra (meningococcal) vaccine administered to their son Dan Liu on May 30, 2008, caused an adverse reaction leading to his death on June 22, 2008. Pet. at ¶ 11. On July 19, 2018, petitioners moved for dismissal. On the same day, the undersigned dismissed the case. On October 30, 2018 petitioners filed a motion for attorneys' fees and costs. On December 21, 2018, respondent filed a response. On January 29, 2019, petitioners filed a reply.

### BACKGROUND

On February 22, 2010, petitioners filed part of Dan's medical records, including his

---

[1] Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy. **This means the decision will be available to anyone with access to the Internet.** When such a decision is filed, petitioner has 14 days to identify and move to redact such information prior to the document's disclosure. If the special master, upon review, agrees that the identified material fits within the banned categories listed above, the special master shall redact such material from public access.

autopsy report and death certificate.   Exs. 1-8.

During the initial status conference held on April 1, 2010, the undersigned ordered petitioners to file the police report and affidavits from each petitioner.   Petitioners' counsel orally moved for subpoena authority to obtain any and all records from Dr. Mofida Elsafty concerning the care and treatment of Dan.   The undersigned granted the informal motion.   On April 29, 2010, petitioner filed the Westfield Police Report and notice indicating there were no records found for Dan from Dr. Elsafty.   Exs. 9-10.

On May 13, 2010, a status conference was held.   The undersigned ordered petitioners to file additional medical records and affidavits from each of the petitioners.

On June 14, 2010, a status conference was held.   The undersigned ordered petitioners to file their affidavits by July 14, 2010 and file an expert report by September 14, 2010. Respondent's Rule 4(c) Report was due by July 14, 2010.

On July 13, 2010, petitioners moved for an enlargement of time by thirty days to file affidavits from each petitioner.   The undersigned granted the motion for an enlargement of time to file petitioners' affidavits.   The undersigned ordered petitioners to file additional medical records by August 12, 2010.

On July 14, 2010, respondent filed his Rule 4(c) Report, stating that this case was not appropriate for compensation.

On August 12, 2010, petitioners filed their affidavits and additional medical records from Goryeb Children's Hospital.   Exs. 11-13.   In their affidavits, petitioners described Dan's condition in the three weeks after his vaccination on May 30, 2008 and before his death on June 22, 2008.   Dan's father, Shingshan Liu, recalled that Dan suffered from a bad headache and fever of 101 degrees Fahrenheit the day after vaccination.   Ex. 12, at 1.   Mr. Liu affirmed that Dan continued to go to school despite his condition, but stayed home for one day on June 9, 2008.   Id. at 1-2.   Mr. Liu also affirmed that Dan's temperature lowered by June 10, 2008 and Dan never returned to his Karate class post-vaccination.   Id. at 2.   Dan's mother, Sue Liu, stated that between May 31, 2008 and June 22, 2008, "Dan seemed not himself."   Ex. 13, at 2.   Mrs. Liu described Dan as suffering from bad headaches, fatigue, poor appetite, and overall tiredness. Ex. 13, at 2-4.   Petitioners both stated on the night before his death, Dan lifted weights, but less than what he could do previously before May 30, 2008.   Ex. 12, at 2; Ex. 13, at 4.   Mr. Liu stated that petitioners planned to take Dan to see the doctor.   Ex. 12, at 2.

On September 14, 2010, petitioners filed a motion for an extension of time to file their expert report by November 15, 2010.   The undersigned granted petitioners' motion.   On November 15, 2010, petitioners filed a second motion for an extension of time to file an expert report by December 30, 2010.   The undersigned granted petitioners' motion.

On December 30, 2010, petitioners filed a third motion for an extension of time to file an

expert report.   During a status conference held on January 6, 2011, the undersigned granted the motion for petitioners to file an expert report by April 1, 2011.   On April 1, 2011, petitioners filed a fourth motion for an extension of time until June 1, 2011 to file an expert report.   The undersigned granted petitioners' motion on April 6, 2011.

On May 25, 2011, petitioners orally moved to stay the deadline for filing their expert report.   Respondent did not object.   The undersigned granted the motion and additionally, ordered petitioners to inform the undersigned of the status of obtaining an expert report at the next status conference set for August 30, 2011.

During the status conference held on August 30, 2011, petitioners' counsel reported that petitioners were in the process of obtaining additional organ samples and autopsy photographs from the Union County medical examiner in order to send them to their pathological expert, Dr. Douglas C. Miller.

During a status conference held on October 11, 2011, petitioners' counsel reported that he was sending Dr. Miller photos of Dan's autopsy and the Union County coroner would work with Dr. Miller to provide him with new tissue samples from the autopsy.

During a status conference held on November 15, 2011, petitioners' counsel reported that he requested additional tissue samples of Dan's brain from the medical examiner's office for Dr. Miller to determine cause of death.

A status conference was held on December 16, 2011.   Petitioners did not receive the tissue samples from the medical examiner's office.

A status conference was held on January 19, 2012.   Petitioners' counsel reported that the tissue blocks were sent to Dr. Miller for analysis.

On March 13, 2012, petitioners' counsel stated during a status conference that Dr. Miller had the tissue samples and new slides were being cut in order for Dr. Miller to examine the brainstem structures.

During the status conference on April 12, 2012, petitioners' counsel reported that Dr. Miller was still reviewing the new autopsy slides.   Petitioners' counsel gave Dr. Miller a deadline of May 14, 2012 to formulate an opinion.

A status conference was held on May 25, 2012.   Petitioners' counsel conveyed that Dr. Miller believed Dan died of severe and rapid brain swelling, not of cardiac arrhythmia. Petitioners' counsel were consulting with a neurologist about what caused the rapid swelling. The undersigned stated that petitioners' neurologist should address the gap in timing between when Dan received the vaccine on May 30, 2008 and when Dan died of rapid brain swelling on June 22, 2008.   The undersigned ordered petitioners to file Dr. Miller's report by June 8, 2012 and the neurologist expert report by July 23, 2012.

On June 5, 2012, petitioners filed Dr. Miller's expert report.   Ex. 14.   In his report, Dr. Miller essentially criticized the medical examiner Dr. Hua's inadequate autopsy of Dan, stating that Dr. Hua's conclusion that Dan died due to cardiac arrhythmia was "informed speculation and not to a reasonable medical probability."   Id. at 2.   Dr. Miller noted that Dan's heart was abnormally heavy, but even so, arrhythmia would not be considered as a primary cause of death. Id.   Because Dan's brain was severely heavy, Dr. Miller opined "that the cause of death in this case is primarily brain swelling with brainstem compression."   Id. at 4.   Dr. Miller noted that, even though it cannot be completely excluded, it is "implausible that the small amount of meningitis present at the time of death was responsible for the cerebral edema," and that "[w]hile at first the finding of meningitis in brain sections from Dan Liu might throw suspicion upon the vaccine, in fact this makes no sense…. The vaccine did not infect Dan Liu with an organism or virus causing meningitis."   Id.   Dr. Miller concluded that "to a reasonable degree of medical probability, the cause of Dan Liu's death was cerebral edema from some unknown catastrophic cause… with death occurring rapidly from onset, certainly no more than about two hours and quite possibly in only minutes."[2]   Id. at 5.

On July 23, 2012, petitioners filed a motion for extension of time to file another expert report.   The undersigned granted the motion.   On September 24, 2012, petitioners filed a second motion for extension of time to file an expert report.   The undersigned granted the motion.   On November 26, petitioners filed a third motion for extension of time to file an expert report.   The undersigned granted the motion.

On December 26, 2012, petitioners filed the expert report of Dr. Yehuda Shoenfeld.   Ex. 16.   In Dr. Shoenfeld's expert report, in support of vaccine causation, he claimed that Dr. Miller "indicated [an] immune system (reactive) cell infiltration to the brain," and further, that Dr. Miller described Dan's death as a "cascade of inflammation the morning of his death, leading to significant edema (as evidenced by the substantial brain weight noted on autopsy)."   Id. at 4. The undersigned considered this statement as not reflective of Dr. Miller's report which stated the cause of death was from minutes to at most two hours before Dan died, not three weeks before.

A status conference was held on January 16, 2013.   The undersigned discussed Dr. Shoenfeld's expert report with the parties.   Dr. Shoenfeld concluded that meningococcal vaccine induced an immunological reaction in Dan's brain that caused his brainstem compression and death.   The undersigned ordered respondent to (1) file an expert report, (2) engage in settlement negotiations, or (3) file an expert report and engage in settlement negotiations.

---

[2] The undersigned has the impression that petitioners' counsel never read Dr. Miller's expert report before he filed it on June 5, 2012.   If he had read it, why would he file it since Dr. Miller says the vaccination had nothing to do with Dan's death, and the death process lasted at most two hours before he died and was due to brain edema.   If Mr. Caldwell had read Dr. Miller's expert report, he should have sent it to petitioners and suggested they agree to dismiss the case.   If they refused, Mr. Caldwell should have withdrawn from the case.   Instead, petitioners' counsel prolonged a case without reasonable basis for another six years.

During a status conference on January 30, 2013, respondent requested additional records regarding Dan's condition prior to his death including his school, extracurricular, and psychology records.   Dan's psychology records were received via email.   Petitioners asserted that they would file Dan's high school records and extracurricular records, as well as retrieve affidavits from Dan's physical education teacher, martial arts teacher, and friends about how Dan was behaving before and after the date of Dan's vaccination.

During a status conference on March 20, 2013, petitioners reported that they were still in the processing of filing Dan's high school records and attempting to contact and obtain affidavits from Dan's friends and martial arts teacher.

On April 22, 2013, a status conference was held.   Petitioners reported that Dan's high school records were incomplete and therefore, they would request complete records.   The undersigned ordered petitioners to file affidavits by Dan's friends and sensei by May 22, 2013.

On May 23, 2013, petitioners filed an affidavit from Angel Albanese, Dan's martial arts teacher.   On the same day, petitioners filed a motion for an extension of time to file affidavits by June 24, 2013.   The undersigned granted petitioners' motion.

On June 11, 2013, petitioners filed affidavits from Alice Li, Dan's family friend and classmate, and Xinyi Zhang, Dan's close friend.   Exs. 62-63.   In both affidavits, neither could recall any changes in Dan or anything unusual about Dan after May 30, 2008, the date of vaccination.

On June 28, 2013, a status conference was held and subsequently, on July 1, 2013, the undersigned issued an Order stating the undersigned's difficulties with this case.   Specifically, the undersigned noted that Dr. Shoenfeld's basis for his expert opinion relied on Dan manifesting, during the three weeks after vaccination, an inflammatory process that caused him fatigue, lethargy, and a headache, which culminated in brain edema.   Doc 54.   However, the affidavits filed, aside from petitioners', did not support Dan displaying such conditions during the three weeks after vaccination and before death.   Id.

During a status conference held on August 15, 2013, the undersigned reviewed the weaknesses in this case.   The undersigned stated that Dr. Shoenfeld's expert opinion that Dan was manifesting an inflammatory process over three weeks prior to his death failed to address Dr. Miller's expert opinion that Dan suffered cerebral edema from an unknown catastrophic cause that caused his death rapidly from onset.   Doc 55.   The undersigned questioned Dr. Shoenfeld's failure to discuss accurately Dr. Miller's opinion regarding onset of inflammation.   Id. at 1-2.   The undersigned also questioned Dan's ability to attend school, complete his projects, and take his examinations if the inflammatory process were occurring in Dan for over three weeks as Dr. Shoenfeld posited.   Id. at 2.   The undersigned ordered petitioners' counsel to present three options to petitioners: (1) move to dismiss this case; (2) attempt to reach a litigative risk settlement; or (3) continue on the current course based on Dr. Shoenfeld's theory of causation.   Id.

On September 24, 2013, a status conference was held.   Petitioners' counsel stated that there were no additional school records to obtain, but he would file Dan's final report card by November 8, 2013.   In addition, petitioners would provide respondent a list of Dan's teachers and their contact information for depositions.

On November 8, 2013, petitioners filed Dan's high school transcript record.   Ex. 64. On the same day, respondent filed a motion for an extension of time to file affidavits or depositions of Dan's teachers.

On November 12, 2013, the undersigned granted respondent's motion for an extension of time until December 23, 2013 to obtain and file statements or depositions from Dan's teachers. A status conference was held on the same day.   The undersigned discussed Judge Bruggink's decision in Allen v. Secretary of Health and Human Services, 24 Cl. Ct. 295 (1991), where a conclusion of vaccination causation can be legitimately drawn where there is an observable and relatively uninterrupted progression from vaccination to death.   The undersigned ordered the parties to consider whether Dan's brain inflammation had observable effects over the three weeks after vaccination and whether those effects indicated a relatively uninterrupted progression.

On December 23, 2013, respondent filed a second motion for an extension of time to file affidavits or depositions of Dan's teachers.   On January 2, 2014, the undersigned granted respondent's second motion for an extension of time to file the statements or depositions of Dan's teachers by February 18, 2014.

On February 12, 2014, respondent filed a Statement of Molly Dennis, Dan's former AP Biology teacher, and a status report stating the results of respondent's efforts in contacting Dan's teachers.   According to Ms. Dennis' statement, she did not recall any differences or notable changes in Dan during the time he was her student in 2007 to 2008.   Ex. A, at 1.   According to respondent's status report, Dan's high school's principal at the time, Peter Renwick, started his position after Dan's death and, thus, did not know Dan.   Doc 62, at 2.   Since two of Dan's teachers retired and were unavailable to speak with respondent, Ms. Dennis was the only teacher from whom respondent was successful in obtaining a statement.   Id. at 2-3.

On March 10, 2014, a status conference was held.   During the status conference, the undersigned and counsel discussed the difficulties of this case, specifically Dr. Shoenfeld attributing falsely statements to Dr. Miller and how Dr. Shoenfeld ignored salient aspects of Dr. Miller's report to reach his conclusion.[3]   Also, respondent reminded the undersigned that petitioners' affidavits differed from their statements[4] to the police on the day of Dan's death.

---

[3] The undersigned has the impression that petitioners' counsel never read Dr. Shoenfeld's expert report before he filed it on December 26, 2012.   If he had read it, why would he file it since Dr. Shoenfeld attributed statements to Dr. Miller that Dr. Miller never made in his expert report.   Mr. Caldwell eventually moved to strike the report at the undersigned's order.

[4] According to the police report, petitioners stated that Dan felt and acted normally before going to bed the night

Doc 64.

Following the status conference on March 13, 2014, the undersigned issued an Order that discussed the issues in this case and granted petitioners' counsel's request to file supplemental expert reports from both Dr. Miller and Dr. Shoenfeld.   In her order, the undersigned summarized the records filed in this case including the police report, petitioners' affidavits regarding Dan's condition during the three weeks after vaccination, Dr. Miller's findings and conclusions, and Dr. Shoenfeld's disparate opinion.   Id.

 On April 25, 2014, petitioners filed a motion for an extension of time to file supplemental expert reports.   On April 28, 2013, the undersigned granted the motion for an extension of time until June 27, 2014 for petitioners to file supplemental expert reports.

On June 27, 2014, petitioners filed a second motion for an extension of time to file a supplemental expert report or a motion to withdraw/substitute counsel.   The motion stated that petitioners and petitioners' counsel have amicably parted ways and petitioners' counsel anticipated filing a motion to withdraw/substitute counsel or filing a supplemental expert report by August 26, 2014.   On July 1, 2014, after discussing the motion during the status conference, the undersigned granted in part and denied in part petitioners' motion for an extension of time.

During the status conference on July 1, 2014, petitioners' counsel reported that Dr. Miller provided a supplemental expert report in which Dr. Miller opined that Dan's vaccination did not cause his death.   The undersigned ordered petitioners to file the supplemental expert report and any medical literature cited in the report by July 1, 2014.   While petitioners had consulted with other doctors and wished to pursue an alternative theory of causation, petitioners' counsel did not want to pursue the case further.   Since Dr. Shoenfeld's report did not reflect accurately Dr. Miller's expert report and the facts in this case, the undersigned ordered petitioners to inform the court whether they wish to strike Dr. Shoenfeld's expert report by July 8, 2014.   The undersigned also ordered that if petitioners did not move to dismiss their petition by August 26, 2014, the undersigned would issue an Order to Show Cause.

On July 1, 2014, petitioners filed Dr. Miller's supplemental expert report reiterating his expert opinion that the cause of Dan's death was cerebral swelling with brainstem compression. Ex. 65, at 2.

On July 8, 2014, petitioners filed a motion to strike Exhibit 16 (Dr. Shoenfeld's expert report) and 17 (Dr. Shoenfeld's curriculum vitae).   The undersigned granted the motion on the same day.

On August 26, 2014, a status conference was held.   Petitioners' counsel found a cardiologist, Dr. Robert Waugh, to prepare an expert report.   The undersigned reminded petitioners' counsel that, according to Dr. Miller, the diagnosis of cardiac arrhythmia as the cause of Dan's death was informed speculation.   Respondent's counsel requested Dr. Miller's

---

before his death.   Ex. 9, at 5.

slides from tissue blocks and information regarding his methodology in making the slides in order to prepare respondent's expert report.   The undersigned ordered petitioners to file Dr. Waugh's expert report by October 20, 2014.

On October 20, 2014, petitioners filed a motion for an extension of time until November 20, 2014 to file Dr. Waugh's expert report.   On the same day, the undersigned granted the motion.   On November 20, 2014, petitioners filed a second motion for an extension of time until December 22, 2014 to file Dr. Waugh's expert report.   On November 24, 2014, the undersigned granted the motion for an extension time.   On December 22, 2014, petitioners filed a third motion for an extension of time until January 21, 2015 to file Dr. Waugh's expert report.   On December 29, 2014, the undersigned granted the motion.   On January 21, 2015, petitioners filed a fourth motion for an extension of time until February 13, 2015 to file Dr. Waugh's expert report.   On January 23, 2015, the undersigned granted the motion.   On February 13, 2015, petitioners filed a fifth motion for an extension of time until February 20, 2015 to file Dr. Waugh's expert report.   On February 18, 2015, the undersigned granted the motion.

Petitioners filed Dr. Waugh's expert report on February 20, 2015.   Ex. 66.   On March 3, 2015, petitioners filed a motion to strike and refile Dr. Waugh's expert report because the initial filing was unsigned.   Doc 84.   The undersigned granted the motion on the same day and petitioners refiled Dr. Waugh's expert report on March 4, 2015.

During a status conference on February 25, 2015, the undersigned reviewed Dr. Waugh's expert report with the parties.   Dr. Waugh concluded that Dan died from eosinophilic myocarditis, relying on an article consisting of two case reports.   The undersigned ordered respondent to file a status report stating how respondent wished to proceed with the case after reviewing Dr. Waugh's expert report.

On March 27, 2015, respondent filed a status report stating that respondent was continuing to evaluate Dr. Waugh's expert report.   Respondent requested additional time to determine whether respondent wanted to file a responsive expert report or to resolve this case informally.   The undersigned granted respondent's request on March 30, 2015, giving respondent until May 4, 2015 to file another status report to state respondent's position.

On May 4, 2015, respondent filed a status report stating that an informal resolution was not appropriate and respondent intended to file a responsive expert report to Dr. Waugh's expert report.

On June 15, 2015, respondent filed a responsive expert report by Dr. Laurence Sperling, expert cardiovascular reviewer.   Dr. Sperling opined that Dr. Waugh's diagnosis that Dan had "eosinophilic myocarditis cannot be substantiated by the available evidence including clinical and anatomic data."   Ex. B, at 4.   Moreover, Dr. Sperling noted that there was no evidence of myocarditis and that "[e]osinophils within the lungs which were noted by Dr. Miller can be consistent with a known history of asthma."   Id.   Dr. Sperling concluded that "it is highly unlikely that the administration of the vaccine resulted in or had any causal or significant effect

on Dan Liu's cardiovascular status or death."   Id. at 5.

During a status conference on June 19, 2015, the undersigned discussed Dr. Sperling's responsive expert report with the parties.   Petitioners wished to file a responsive expert report from Dr. Waugh and respondent objected to prolonging this case with another supplemental expert report.   Citing to Vaccine Rule 3(b)(2), the undersigned discussed that she must give each side a "full and fair opportunity" to present their or his case.

On August 3, 2015, petitioners filed Dr. Waugh's supplemental expert report responding to Dr. Sperling's responsive expert report.   Dr. Waugh disagreed with Dr. Sperling, stating that the absence of histological evidence of eosinophilic myocarditis does not preclude the diagnosis. Ex. 70, at 1.   Instead, Dr. Waugh posited that "inflammation itself is sufficient to cause cardiac instability and arrest" and in Dan's case, based on his "pre-death's symptoms of low grade fevers and general malaise … [Dr. Waugh] believes [Dan] had an eosinophilic myocarditis that led to cardiac instability, arrhythmia, and death."   Id.

On August 13, 2015, the undersigned discussed Dr. Waugh's supplemental expert report with the parties during a status conference.   The undersigned stated that the parties can either settle or the case can proceed to hearing.   Respondent's counsel reported that she will convey any demand she receives from petitioners, but did not know whether respondent was receptive to settlement negotiations.   The undersigned then ordered petitioners to communicate a demand to respondent and file a status report indicating such by September 14, 2015.

On September 14, 2015, petitioners filed a status report stating that petitioners transmitted a demand to respondent.   Petitioners requested filing a joint status report on the progress of settlement negotiations.   The undersigned denied petitioners' request in light of the scheduled status conference.

On October 15, 2015, a status conference was held.   Respondent's counsel stated that respondent wants to defend the claim and the parties requested an entitlement hearing.

On November 6, 2015, the undersigned issued a Pre-Hearing Order, setting a one-day entitlement hearing for February 26, 2016.

On January 26, 2016, respondent filed a prehearing brief.   On January 29, 2016, petitioners filed their prehearing brief along with medical literature (Exs. 72-117).

On February 4, 2016, the undersigned and the parties discussed the prehearing submissions that petitioners filed during a status conference.   Respondent's counsel stated that petitioners' prehearing brief and medical articles presented a more detailed theory of causation than what Dr. Waugh had discussed, including a theory that molecular mimicry caused Dan's death.   The undersigned discovered that Amber Wilson, petitioners' counsel's associate, who has a doctorate in cellular pharmacology and a master's degree in genetics, co-authored petitioners' prehearing brief.   Respondent's counsel requested the undersigned postpone the

hearing in order for Dr. Sperling to prepare adequately for the hearing given petitioners' recent filings and different theory of causation.  The undersigned, again, cited to Vaccine Rule 3(b)(2), which required the undersigned to give each party a "full and fair opportunity" to present their or his case.  The undersigned cancelled the hearing scheduled for February 26, 2016 and ordered petitioners to ask Dr. Waugh to write a third expert report stating whether he concurs with the theories submitted in petitioners' prehearing brief.

On March 4, 2016, petitioners filed another supplemental expert report from Dr. Waugh, which stated that Dr. Waugh agreed and adopted the medical discussions in petitioners' prehearing brief.  Dr. Waugh reiterated that he believed "to a reasonable degree of medical probability, the Menactra vaccine was a substantial factor in bringing about the cardiac event that resulted in the death of Dan Liu."  Ex. 118, at 1.

On March 14, 2016, a status conference was held.  Respondent's counsel was concerned with Dr. Waugh's concurrence with medical theories relating to immunology when Dr. Waugh is a cardiologist.  Petitioners' counsel requested having Dr. M. Eric Gershwin, an immunologist, write an expert report for petitioners.  Respondent's counsel expected to file a responsive expert report from an immunologist if petitioners filed an expert report from Dr. Gershwin.

On May 26, 2016, a status conference was held.  The undersigned ordered petitioners to file Dr. Gershwin's expert report by June 28, 2016.

On June 2, 2016, petitioners filed Dr. Gershwin's expert report.  Dr. Gershwin opined he knew nothing about eosinophilic myocarditis but relied on Dr. Waugh that Dan died from it. Dr. Gershwin relied on medical articles to posit that after receiving the vaccine, Dan "developed a cytokine-driven, tissue-specific accumulation of eosinophils."  Ex. 119, at 6.  In his report, Dr. Gershwin discussed hypersensitivity cardiomyopathies, where "it is common for patients to die suddenly" and "it is generally believed that such inflammatory myocardial lesions are related to a drug reaction."  Id. at 2.  Dr. Gershwin stated that for Menactra vaccines, "[a]llergic reactions have been described but eosinophilic cardiomyopathy would be extremely rare" and, in Dan's case, the tissue specificity seen would make it difficult to explain.  Id. at 5.  However, Dr. Gershwin noted that "[a] vaccine should be considered the same as any foreign substance" that can produce tissue-specific reactions.  Id. at 5-6.

On June 28, 2016, a status conference was held where the undersigned discussed Dr. Gershwin's expert report with the parties.  Petitioners' counsel was in the process of sending respondent the requested autopsy slides and the slides created by Dr. Miller.  The undersigned ordered respondent to file responsive expert reports by September 23, 2016.

On September 22, 2016, respondent filed a motion for an extension of time until October 24, 2016 to file expert reports.  On the same day, the undersigned granted respondent's motion. On October 21, 2016, respondent filed a second motion for an extension of time until November 7, 2016 to file expert reports.  On October 24, 2016, the undersigned granted respondent's motion.

On November 7, 2016, respondent filed a supplemental expert report from Dr. Sperling and an expert report from Dr. Noel Rose, immunologist.   Dr. Sperling concluded that "it is highly unlikely that the administration of the vaccine resulted in or had any causal or significant aggravating effect on Dan Liu's cardiovascular status or death."   Ex. D, at 3.   Regarding Dan's heart, Dr. Rose stated that "there was neither evidence of myocyte disarray nor inflammatory heart disease, virtually excluding acute or chronic myocarditis of any type. Specifically, there was no evidence of eosinophilic myocarditis."   Ex. E, at 6.   Dr. Rose opined that there was no causal connection between Menactra vaccination and Dan's death.   Id.   Both doctors explained that the eosinophilic material found in Dan's lungs could be consistent with chronic asthma or allergies.   Ex. D, at 2; Ex. E, at 2.

On November 14, 2016, a status conference was held.   The undersigned discussed Dr. Sperling's and Dr. Rose's expert reports.   Petitioners' counsel requested time for Dr. Waugh and Dr. Gershwin to review respondent's experts' reports.   The undersigned ordered petitioners to file supplemental expert reports by January 20, 2017, if petitioners' expert Dr. Gershwin wished to reply.

On January 20, 2017, petitioners filed Dr. Gershwin's supplemental expert report.   Ex. 126.   Dr. Gershwin mischaracterized respondent's experts' opinions as being in agreement that Dan died from cardiac arrhythmia.   Id. at 1.   He continued to adhere to his original opinion. Id.

On January 30, 2017, a status conference was held.   The undersigned discussed Dr. Gershwin's supplemental expert report with the parties.   Petitioners wanted to proceed with an entitlement hearing.   The undersigned ordered the parties to provide available dates for hearing by March 1, 2017.

On March 1, 2017, the undersigned granted a joint motion for an extension of time until March 22, 2017 to provide available dates for an entitlement hearing.

On March 23, 2017, the undersigned issued a Pre-Hearing Order, setting a two-day entitlement hearing to start on March 7, 2018.

On April 27, 2017, a status conference was held.   Petitioners' counsel reported that petitioners were looking for a cardiologist to replace Dr. Waugh, who was in hospice and would not be able to participate further in this case.   The undersigned stated that there were certain difficulties with this case including Dr. Waugh's opinion that Dan had eosinophilic myocarditis when there was no evidence of eosinophils in Dan's heart.   The undersigned encouraged petitioners' counsel to speak with petitioners about dismissing the case.

On June 7, 2017, a status conference was held.   Petitioners' counsel reported that petitioners retained a cardiologist to review the records and if the cardiologist's opinion did not support this case, petitioners' counsel would move to dismiss the case.   The undersigned

ordered petitioners to file either an expert report or the appropriate pleading to dismiss the case by August 7, 2017.

On August 7, 2017, petitioners filed a motion for an extension of time until August 21, 2017 to file an expert report.   On the same day, the undersigned granted petitioners' motion.

On August 21, 2017, petitioners filed an expert report from Dr. Frederick Yturralde, a cardiologist.   Dr. Yturralde concluded that "within a reasonable degree of medical probability, that the [Menactra] vaccine did, in fact, cause Dan's death."   Ex. 128, at 1.   Dr. Yturralde opined that Dan had fulminant myocarditis, rather than eosinophilic myocarditis as Dr. Waugh opined.   Dr. Yturralde stated that "the fatigue, loss of appetite, fevers, and the fact that [Dan] no longer had the stamina to engage in martial arts or weight lifting, all point toward progressive heart failure due to fulminant myocarditis," and "[t]he final finding supporting fulminant myocarditis was the thickened septum found on autopsy."   Id. at 2.   Dr. Yturralde stated he could not prove causation from the vaccine and deferred that opinion to an immunologist.

On August 24, 2017, the undersigned issued an order giving petitioners until September 29, 2017 to file a second supplemental expert report from Dr. Gershwin discussing whether or not Menactra vaccine can cause fulminant myocarditis and, if so, whether three weeks was an appropriate interval that would fit within petitioners' causation theory.

On September 29, 2017, petitioners filed Dr. Gershwin's second supplemental expert report.   Dr. Gershwin stated that he reviewed Dr. Yturralde's report and believed that the thickened septum, as Dr. Yturralde pointed out, was consistent with inflammation and eosinophilic myocarditis.   Ex. 130, at 1.   Dr. Gershwin repeated his findings in his first report and added that he continued to "opine that the septal defect is due to tissue-specific accumulation of inflammatory cells, of which eosinophils would be dominant."   Id.   He concluded by emphasizing that "there was no history of viral infection, nor was there any evidence of any other environmental factor," and "that reactions such as this are extremely rare and unpredictable and illustrate the diversity of the immune system and the unique promiscuous response of an individual."   Id.

On October 24, 2017, the undersigned issued an order and filed Court Exhibit 1, an article discussing low-grade inflammation relating to hypertrophic cardiomyopathy.   In her Order of October 24, 2017, the undersigned did not make a finding that Dan had hypertrophic cardiomyopathy.

On November 30, 2017, respondent filed a motion for an extension of time until December 15, 2017 to file two supplemental expert reports.   On the same day, the undersigned granted respondent's motion.

On December 8, 2017, a status conference was held.   Respondent reported that, since Dr. Sperling could no longer participate in this case, respondent intended to file an expert report from respondent's new cardiologist.   The undersigned ordered respondent to file a status report

by January 8, 2018 to let the court knows when a new expert report would be filed.   After reviewing and discussing petitioners' expert reports and cited medical literature, the undersigned questioned how it was possible that a tissue-specific accumulation of eosinophils can explain Dan's thickened septum when Dan did not have eosinophils in his heart.   Moreover, Dr. Gershwin's second supplemental report did not reflect the change in petitioners' theory from eosinophilic myocarditis to fulminant myocarditis.   The undersigned then ordered petitioners to file a status report by December 22, 2017 stating petitioners' view on (1) striking medical literature referenced in Dr. Shoenfeld's stricken expert report; (2) striking Dr. Waugh's expert report and cited medical literature; and (3) striking Dr. Gershwin's second supplemental expert report.

On December 21, 2017, petitioners filed a status report requesting the undersigned to strike only the cited medical literature in Dr. Shoenfeld's expert report.   On December 22, 2017, the undersigned granted petitioners' informal motion to strike.

On January 8, 2018, respondent filed a status report notifying the undersigned that respondent expected to file an expert report from respondent's new cardiologist by March 16, 2018.

On January 19, 2018, a status conference was held.   In light of the change of expert witnesses for both parties, the undersigned cancelled the hearing that was scheduled for March 7-8, 2018.

On March 14, 2018, respondent filed a motion for an extension of time until March 28, 2018 to file an expert report.   On the same day, the undersigned granted respondent's motion.

On March 23, 2018, respondent filed an expert report from Dr. Scott Yeager, a cardiologist.   Dr. Yeager stated, "The finding of eosinophilic proteinaceous fluid in the lungs is a nonspecific observation of pink stained fluid that has no relationship to a hypersensitivity reaction. It appears that both Dr. Gershwin, Dr. Waugh, and possibly Dr. Sperling misinterpreted this finding as describing actual eosinophils in the lungs." Ex. G, at 3-4.   Dr. Yeager concluded that in his neuropathologic opinion and to a reasonable degree of medical certainty, Dan's cause of death was cerebral edema and that the Menactra vaccine did not contribute to Dan's death in any significant way.   Id. at 9.

On April 9, 2018, a status conference was held.   The undersigned discussed Dr. Yeager's expert report and Dr. Gershwin's supplemental expert report with the parties.   The undersigned stated that Dr. Gershwin did not support the theory that Menactra vaccine could cause fulminant myocarditis in support of Dr. Yturralde's theory.   The undersigned ordered petitioners to file Dr. Yturralde's responsive expert report by June 8, 2018 and Dr. Gershwin's third supplemental expert report by July 9, 2018.

On June 6, 2018, petitioners filed a motion for an extension of time until June 11, 2018 to file Dr. Yturralde's responsive expert report.   On the same day, the undersigned granted

petitioners' motion.

On June 11, 2018, petitioners filed the responsive expert report from Dr. Yturralde.   Ex. 131.   Dr. Yturralde stayed with his conclusion that Dan had fulminant myocarditis and opined Menactra caused it, relying on Dr. Waugh's and Dr. Gershwin's prior opinions that Menactra caused Dan to have eosinophilic myocarditis and Dr. Yturralde's accepting that Dan changed during the three weeks after vaccination (an assessment that Dan's two classmates and teacher deny in their affidavits stating that Dan seemed normal during that time period).

On July 3, 2018, the undersigned issued an Order requiring Dr. Gershwin to recognize Dr. Yturralde's rejection that Dan had eosinophilic myocarditis.   The undersigned continued to state that petitioners filed expert reports that provided inconsistent theories.   The undersigned stated that she would strike Dr. Gershwin's third supplemental expert report when filed if he insisted that Dan died of eosinophilic myocarditis.

On July 5, 2018, petitioners filed a motion for an extension of time to file Dr. Gershwin's third supplemental expert report.   On the same day, the undersigned granted petitioners' motion.

On July 19, 2018, petitioners filed a motion to dismiss.   The undersigned dismissed the petition on the same day.   In her decision dismissing the petition, the undersigned stated that petitioners should have moved to dismiss after filing Dr. Miller's initial expert report because that was when a reasonable basis to proceed ceased.   Judgment entered on August 22, 2018.

## MOTION AND FILINGS

On October 30, 2018, petitioners filed a motion for attorneys' fees and costs.   Petitioners requested $235,509.90 in attorneys' fees and $37,342.69 in attorneys' costs, for a total request of $272,852.59.   Petitioners did not incur any personal costs.

On November 5, 2018, petitioners filed an amended motion for payment of petitioners' attorneys' fees and reimbursement of case costs pursuant to 42 U.S.C. § 300aa-15 and Vaccine Rule 13.   The motion included a supplemental invoice for case costs incurred in September 2012 for an expert report from Dr. Shoenfeld.   Ex. 141.   The undersigned granted petitioners' motion to amend.   Following amending, petitioners requested $235,509.90 in attorneys' fees and $46,342.69 in attorneys' costs for a total request of $281,852.59.   Petitioners did not incur any personal costs.

Along with petitioners' motion for attorneys' fees and costs, petitioners filed a brief in support of an award of attorneys' fees and costs.   Doc 148.   Petitioners argued that "the testimonial, medical, literature, and expert facts adduced in this case fulfilled the requirements to meet the 'reasonable basis' standard from the time the case was filed until it was voluntarily dismissed."   Id. at 1-2.   Petitioners stated that reasonable basis is an objective consideration that is determined by the totality of circumstances.   Id. at 2 (citing Chusiano v. United States, 116 Fed. Cl. 276, 289 (2014); McKellar v. Sec'y of HHS, 101 Fed. Cl. 297, 303 (2011)).   Petitioners

claimed that they were entitled to investigate two different medical theories that could have explained Dan's death as being causally related to his vaccination based on petitioners' recollection of Dan's symptoms after receiving the vaccination, Dan's autopsy report, and Dr. Miller's expert report.

Petitioners argued that Dr. Miller, in his first report, stated "simply that there was no fatal brain inflammation and that he found no other cause of death."[5]  Doc 148, at 4.   Petitioners stated that after Dr. Miller confirmed his findings[6] in his second expert report, the brain-based theory to Dan's death was ruled out, but the heart-based theory[7] remained, and therefore reasonable basis was not lost.   Id.   Petitioners posited that vaccination caused a heart-based reaction that led to Dan's death based on Dr. Miller's note of eosinophilic proteinaceous fluid in Dan's lungs and that there was a history in the Vaccine Program of cardiac-based vaccine injuries.   Id. at 12-13; Id. at footnote 3-5.   Petitioners continued to argue that they had a reasonable basis to investigate "the case from the perspective of the heart-based theory," by discussing a plethora of various medical theories concerning the difficulty in diagnosing myocarditis and the association between myocarditis and vaccinations.   Id. at 13-26.

Petitioners argued Dr. Yturralde's diagnosis that Dan had fulminant myocarditis rather than eosinophilic cardiomyopathy was likely a scrivener's error.[8]   Id. at 11.   Petitioners added that regardless of the error, "fulminant myocarditis is simply a subset of myocarditis and it includes fulminant eosinophilic myocarditis," and therefore, petitioners never strayed from a logical investigation based on the heart-based theory and continued to have reasonable basis to pursue their claim.   Id.   However, the undersigned finds that there is no proof that fulminant myocarditis includes fulminant eosinophilic myocarditis, particularly since Dr. Yturralde rejected diagnosing Dan with eosinophilic myocarditis.

Further, petitioners argued the undersigned acknowledged that reasonable basis existed by telling petitioners to make a demand on respondent in her Order of August 13, 2015.   Id. at 5. Petitioners argued Vaccine Rule 5[9] requires special masters to know the facts of each case

---

[5] Actually, Dr. Miller had "no good answer" for what caused the cerebral edema, but he did conclude to a reasonable degree of medical probability that Dan's cerebral edema "led to neurogenic pulmonary edema and histological changes of subendocardial ischemia, with death occurring rapidly from onset, certainly no more than about two hours and quite possibly in only minutes."  Ex. 14, at 4-5.  Moreover, as the undersigned discussed in her dismissal decision, Dr. Miller stated that it "makes no sense" to connect the meningitis vaccine to Dan's death even though he found meningitis in some of Dan's brain sections.  Id. at 4.

[6] In his supplemental report, Dr. Miller essentially reiterated the conclusions he stated in his first report, which ruled out vaccination as a cause of the brain swelling that led to Dan's death.  Ex. 65, at 2.

[7] There was no heart-based theory indicated in Dr. Miller's report.   Dr. Miller stated that there were eosinophils in Dan's lungs, not in Dan's heart.  Ex. 14 at 3.

[8] Actually, in both of his reports, Dr. Yturralde explicitly theorized that Dan had fulminant myocarditis and rejected that Dan had eosinophilic cardiomyopathy.   Dr. Yturralde wrote, "I agree, generally, with Dr. Waugh's opinion in this case. Dan Liu had a myocarditis. Based on the young man's clinical history and progressive decline physically, a diagnosis of fulminant, rather than eosinophilic, myocarditis, is more appropriate."  Ex. 128, at 1.

[9] Vaccine Rule 5(a) addresses the preliminary status conference and tentative findings and conclusions, and states "The special master will hold a status conference within 30 days after the filing of respondent's report under Vaccine Rule 4(c) to: (1) afford the parties an opportunity to address each other's positions; (2) review the materials

comprehensively and therefore, "[i]t would be tantamount to entrapment to suggest to the parties that settlement be attempted and then deprive counsel of the fees and costs necessary to get the case to that point."   Id. at 7.

On December 21, 2018, respondent filed a response opposing petitioners' motion stating that petitioners failed to demonstrate a reasonable basis for their claim and therefore petitioners' motion for attorneys' fees and costs should be denied.   Doc 151.   Respondent argued that a claim cannot gain or lose reasonable basis during the course of litigation.   Id. at 11. Respondent requested the undersigned reject the interpretation in Perreira v. Secretary of Health and Human Services, 33 F.3d 1375 (Fed. Cir. 1994) that permits "limited awards of attorneys' fees if the special master concludes that the claim had and lost reasonable basis."   Respondent argued that Perreira is best understood as addressing the good faith inquiry and not reasonable basis.   Id. at 13-14.

Respondent opposed any award of attorneys' fees and costs because "petitioners did not offer any evidence of a factual or medical basis for their claim of vaccine causation at any point, including from the time they filed their petition up to the time that Dr. Miller filed his first or second opinion."   Id. at 14.   Respondent stated that at the time of filing, petitioners' claims did not cite to any evidentiary support and neither of the alleged medical theories was developed. Id. at 15.   Respondent also argued that "Further investigating a second theory of causation after their primary theory fell apart is tantamount to a fishing expedition."   Id. at 16.   Respondent reasoned that petitioners are essentially claiming that they had reasonable basis based on their counsel's persistent investigation of two medical theories, but counsel's conduct is irrelevant to a reasonable basis analysis.   Id. at 16-17 (citing Simmons, 875 F.3d 632, 636 (Fed. Cir. 2017)).

Lastly, respondent argued that "Neither Section 13 of the Vaccine Act nor Vaccine Rule 5 supports petitioners' argument regarding a nexus between being directed to present a settlement demand and reasonable basis in this case."   Id. 17 (citing Woods v. Sec'y of HHS, 105 Fed. Cl. 148, 153 (2012) (ruling that "engaging in settlement negotiations does not in itself establish the reasonable basis of a claim.")).   Respondent stated that "the special master set a deadline ordering petitioners to convey a demand by a certain date was simply an exercise in docket management, not an indication regarding whether petitioners' claim had reasonable basis."   Id. at 18.

On January 29, 2019, petitioners filed a reply to respondent's response to petitioners' motion for attorneys' fees and costs.   Doc 153.   Along with their reply, petitioners filed an updated fee invoice for work in filing petitioners' reply.   Ex. 142.   Petitioners requested an additional $8,327.20 in attorneys' fees.   Following the requested additional fees, petitioners now

---

submitted and evaluate the parties' respective positions; and (3) present tentative findings and conclusions." Regarding imposing fees and costs, section (c) states, "to ensure effective case management, the special master is authorized under RCFC 16(f)(2) to order a party, its attorney, or both to pay the reasonable expenses – including attorneys' fees – incurred because of any noncompliance with a scheduling or other pretrial order unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust."   The undersigned does not see how Rule 5 supports petitioners' counsel's argument since the conference in question was neither a preliminary status conference nor did the undersigned issue any tentative findings and conclusions.

request $243,837.10 in attorneys' fees and $46,342.69 in attorneys' costs for a total request of $290,179.79.

Petitioners argued that respondent conflated good faith with reasonable basis and specifically, that "There has been no argument offered here that Dan Liu's mother and father had less than an honest belief that they were entitled to compensation."   Doc 153, at 3.

Petitioners relied heavily on the "totality of circumstances" test to affirm that petitioners' claim had reasonable basis, arguing that factors include "the attorney's diligence in bringing the claims when considering whether there was a reasonable basis for a claim under the Vaccine Act."   Id. at 4-5 (citing Simmons, 128 Fed. Cl. 579, 583 (2017)).   However, the Federal Circuit held in Simmons that the attorney's diligence is not relevant.   Simmons, 875 F.3d at 636.   The only relevant inquiry is whether petitioners objectively had a reasonable basis to file a petition. By extension, under Perreira, when petitioners had a reasonable basis to file a petition, did they objectively lose that reasonable basis during the pendency of the case?

Petitioners proceeded to list the "ample supportive evidence" to show that petitioners' claim had reasonable basis throughout the pendency of the case including Dan's pre-vaccination and vaccination medical records, autopsy and police reports, petitioners' affidavits, Dr. Miller's expert report, and Dr. Waugh's expert report.   Id. (citing Chuisano, 116 Fed. Cl. 276, 286-88 (2014)).   Petitioners continued to argue the petition was filed in compliance with the pleading requirements under Vaccine Rule 2 and that medical opinion is not required to be filed at the time of filing.   Id. at 10-11.   Again, petitioners offered that Dr. Miller's report did not end reasonable basis because the finding of eosinophils in Dan's lungs warranted further investigation into a diagnosis of eosinophilic myocarditis.   Id. at 12.

Petitioners stated that respondent's argument to reject the holding in Perreira that reasonable basis may exist at the time of filing and later lost completely ignores "well-settled law."   Id. at 9.

This matter is now ripe for adjudication.

## DISCUSSION

### I.   Entitlement to Fees Under the Vaccine Act

#### a.   Legal Standard

Under the Vaccine Act, a special master or a judge on the U.S. Court of Federal Claims may award fees and costs for an unsuccessful petition if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."   42 U.S.C. § 300aa-15(e)(1); Sebelius v. Cloer, 133 S. Ct. 1886, 1893 (2013).

"Good faith" is a subjective standard.   Hamrick v. Sec'y of HHS, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).   A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred.   Turner v. Sec'y of HHS, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).   Petitioners are "entitled to a presumption of good faith."   Grice v. Sec'y of HHS, 36 Fed. Cl. 114, 121 (1996).

"Reasonable basis" is not defined in the Vaccine Act or Rules.   Deciding whether a claim was brought in good faith and had a reasonable basis "is within the discretion of the Special Master."   Simmons v. Sec'y of HHS, 128 Fed. Cl. 579, 582 (2016), aff'd, 875 F. 3d 632 (2017) (quoting Scanlon v. Sec'y of HHS, 116 Fed. Cl. 629, 633 (2014) (citing Davis v. Sec'y of HHS, 105 Fed. Cl. 627, 633 (2012)).   In determining reasonable basis, the Federal Circuit has clarified in Simmons that it is "an objective inquiry unrelated to counsel's conduct."   Simmons, 875 F.3d at 636.   In determining reasonable basis, the court looks "not at the likelihood of success [of a claim] but more to the feasibility of the claim."   Turner, 2007 WL 4410030, at *6 (citing Di Roma v. Sec'y of HHS, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)).

While a petitioner may have a reasonable basis to file a petition, the reasonable basis can be lost as the case develops.   In Pereira, the Federal Circuit upheld a special master's decision awarding attorneys' fees and costs only up until the hearing began.   Pereira, 33 F.3d at 1377. The special master found that petitioners should have realized that they did not have a reasonable basis to move forward with the case once they reviewed their expert's opinion prior to the hearing and saw the opinion was unsupported by medical literature or studies.   Id. at 1377.   The Federal Circuit noted that "Congress must not have intended that every claimant . . . collect attorney fees and costs" because the funds that are payable under the statute are limited.   Id. "Petitioners are not given a blank check to incur expenses without regard to the merits of their claim."   Pereira, 27 Fed. Cl. 29, 34 (Fed. Cl. 1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994).

### b.   Good faith and reasonable basis

Petitioners are entitled to a presumption of good faith, and respondent does not contest that the petition was brought in good faith.[10]   Grice, 36 Fed. Cl. at 121.   As the Federal Circuit stated in Simmons, good faith and reasonable basis are two distinct facets with good faith being subjective while reasonable basis being an objective inquiry.   Simmons, 875 F.3d at 635 (citing Chuisano, 116 Fed. Cl. 276, 289 (2014)).   The undersigned finds that petitioners had good faith. Therefore, the undersigned finds that the good faith requirement is satisfied.

Petitioners alleged that Menactra vaccine, a vaccine listed on the Table, administered three weeks prior to their otherwise healthy son, was causally related to his sudden death.

---

[10] In crafting his argument persuading the undersigned to reject the interpretation that reasonable basis can be lost, respondent cited a statement in Pereira that good faith can be lost once it is evident that a petitioner's claim no longer has reasonable basis.   Doc 151, at 13 (citing Pereira, 33 F.3d at 1377 ("when the reasonable basis that may have been sufficient to bring the claim ceases to exist, it cannot be said that the claim is maintained in good faith.")). The undersigned doubts that this statement is more than dictum.   Moreover, respondent never contested petitioners' good faith in this case.

Petitioners also filed vaccination records evidencing the receipt of the related vaccine, prior medical records indicating no brain swelling three months prior to the vaccination, and the autopsy report finding slight brain swelling and edema after death.   At the initial stage of pursuing petitioners' claim, the reasonable basis requirement was satisfied.

Although, reasonable basis was initially satisfied, petitioners subsequently lost reasonable basis when they filed Dr. Miller's first expert report on June 5, 2012.   Similar to petitioners in Perreira, petitioners here should have realized that they did not have a reasonable basis to proceed once they reviewed their expert's report stating the cause of Dan's death was not related to his meningococcal vaccination.   Dr. Miller also ruled out cardiac arrhythmia as the cause of Dan's death and attributed the cause to brain swelling from an unknown cause.   Moreover, Dr. Miller's report concluded that Dan died no more than two hours or even quite possibly minutes from the onset of whatever killed him.   At this point, when petitioners' own expert denied Dan's death was related to his vaccination, petitioners' claim was clearly undermined and no longer objectively feasible.

Contrary to petitioners' counsel's attempt to justify proceeding by attempting to equate eosinophils in the lungs with eosinophilic myocarditis by mischaracterizing Dr. Miller's first expert report and misrepresenting Dr. Yturralde's diagnosis as a scrivener's error, the objective evidence shows petitioners lost reasonable basis to proceed in their case.

Petitioners' argument that the undersigned acknowledged reasonable basis by asking petitioners to make a demand on respondent is not only without merit, but also in opposition to the policy of settlement negotiations within the Vaccine Program.   See Woods, 105 Fed. Cl. at 153 ("The policy of encouraging settlement is paramount in the context of the Vaccine Act, which Congress designed to 'provide for a less-adversarial, expeditious, and informal proceeding for the resolution of petitions.'").

Petitioners' argument regarding the attorneys' diligence in bringing the claims has no merit and conflicts with the Federal Circuit's holding in Simmons, which held that an attorney's conduct is irrelevant in accessing whether there is a reasonable factual basis for a petitioner's claim.   Simmons, 875 F.3d at 636.

In light of the Federal Circuit's recent decision confirming that "A claim can lose its reasonable basis as the case progresses," respondent's argument rejecting this interpretation of Perreira is without merit.   R.K., L.K., on Behalf of A.K., a Minor v. Sec'y of HHS, 2019 WL 1222835, at *2 (Fed. Cir. Mar. 15, 2019) (citing Perreira, 33 F.3d at 1376-77).   In R.K., the Federal Circuit affirmed the special master's decision declining an award of attorneys' fees and costs associated with an appeal of entitlement because the appeal lacked reasonable basis.

After the filing of Dr. Miller's expert report on June 5, 2012, reasonable basis no longer existed for petitioners' claim.   Thus, the undersigned awards reasonable attorneys' fees up until June 5, 2012.   However, the undersigned will award the attorneys' fees incurred in filing the motion for attorneys' fees and costs as well as the reply to respondent's response to petitioner's

motion for attorneys' fees and costs.[11]   Accordingly, this results in an initial **deduction of $178,122.10** from the total award in attorneys' fees.

## II.   Reasonableness of Requested Attorneys' Fees and Costs

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."   Avera, 515 F.3d 1343, 1348 (Fed. Cir. 2008).   This rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." Rodriguez v. Sec'y of HHS, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing Avera, 515 F. 3d at 1349).   For cases in which forum rates apply, McCulloch provides the framework for determining the appropriate hourly rate range for attorneys' fees based upon the attorneys' experience.   See McCulloch v. Sec'y of HHS, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).

Once the applicable hourly rate is determined, it is applied to the "number of hours reasonably expended on the litigation."   Avera, 515 F.3d at 1348.   Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary."   Saxton v. Sec'y of HHS, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).   Counsel must submit fee requests that include contemporaneous and specific billing entries indicating the task performed, the number of hours expended on the task, and who performed the task.   See Savin v. Sec'y of HHS, 85 Fed. Cl. 313, 316-18 (Fed. Cl. 2008).   It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done."   Id.   Furthermore, the special master may reduce fees *sua sponte*, apart from objections raised by respondent and without providing petitioners notice and opportunity to respond.   See Sabella v. Sec'y of HHS, 86 Fed. Cl. 201, 208-09 (Fed. Cl. 2009).   A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees.   Broekelschen v. Sec'y of HHS, 102 Fed. Cl. 719, 729 (Fed. Cl. 2011).

### a.  Reasonable Hourly Rates

Petitioner requests the following hourly rates for the period from June 25, 2009 to June 5, 2012 and for the period of July 20, 2018 to January 29, 2019:

|                     | 2009 | 2010 | 2011  | 2012  | 2018 | 2019 |
|---------------------|------|------|-------|-------|------|------|
| Kimberly Miller     | $75  | N/A  | N/A   | N/A   | N/A  | N/A  |
| Sarah Kolke         | $95  | $95  | $135  | $135  | N/A  | N/A  |
| Elizabeth Beckwith  | $75  | $75  | N/A   | N/A   | N/A  | N/A  |
| Elizabeth Giese     | N/A  | $75  | N/A   | N/A   | N/A  | N/A  |
| Gricel Candelaria   | N/A  | $75  | N/A   | N/A   | N/A  | N/A  |

---

[11]  After a review of the billing records, petitioners incurred $7,769.30 in preparing and filing the motion for attorneys' fees and costs and $8,327.20 in preparing and filing the reply, totaling $16,096.50 in attorneys' fees relating to petitioners' motion for attorneys' fees and costs.

| Anisley Valdes | N/A | N/A | $105 | N/A | N/A | N/A |
|---|---|---|---|---|---|---|
| Kimberly Grabbe (paralegal) | N/A | $75 | $105 | $135 | N/A | N/A |
| Jennifer Lally (paralegal) | N/A | N/A | N/A | N/A | $148 | N/A |
| Liya Mogese (paralegal) | N/A | N/A | N/A | N/A | $148 | N/A |
| Tabitha Stone (paralegal) | N/A | N/A | $135 | $135 | N/A | N/A |
| Tara Thorn (paralegal) | N/A | N/A | N/A | N/A | $148 | $154 |
| Altom Maglio (atty) | $275 | N/A | N/A | N/A | N/A | N/A |
| Franklin John Caldwell (atty) | $275 | $275 | $300 | $300 | $391 | $404 |

Based on her experience and review of the billing records submitted by petitioners, the undersigned finds petitioners' attorneys' fees rates to be acceptable and in conformance with what other special masters have awarded Maglio Firm attorneys and paralegals except for the attorney rates for Mr. Caldwell.   Petitioners' request for an hourly rate of $391 for 2018 and $404 for 2019 for Mr. Caldwell's work will be reduced to an hourly rate of $385 for 2018 and $400 for 2019, which reflects what the Office of Special Masters has previously awarded Mr. Caldwell based on his experience and work with the Vaccine Program.   This rate reduction results in a further deduction of **$153.00**[12] of the total attorneys' fees award.

### b.  Reasonable Hours

Special masters have previously reduced the fees paid to petitioners due to excessive and duplicative billing.   See Ericzon v. Sec'y of HHS, No. 10-103V, 2016 WL 447770 (Fed. Cl. Spec. Mstr. Jan. 15, 2016) (reduced overall fee award by 10 percent due to excessive and duplicative billing); Raymo v. Sec'y of HHS, No. 11-654V, 2016 WL 7212323 (Fed. Cl. Spec. Mstr. Nov. 2, 2016) (reduced overall fee award by 20 percent), mot. for rev. denied, 129 Fed. Cl. 691 (2016).   Special masters have previously noted the inefficiency that results when cases are staffed by multiple individuals and have reduced fees accordingly.   Sabella, 86 Fed. Cl. at 209. Additionally, the undersigned has previously found it reasonable to reduce the fees paid to petitioners due to billing for intra-office communication.   Soto v. Sec'y of HHS, No. 09-897V, 2011 WL 2269423, at *6 (Fed. Cl. Spec. Mstr. June 7, 2011); Carcamo v. Sec'y of HHS, No. 97-483V, 2011 WL 2413345, at *7 (Fed. Cl. Spec. Mstr. May 20, 2011).

After reviewing the billing records, the undersigned finds that counsel included entries that are duplicative due to both attorneys and paralegals billing for review of the same electronic notices and scheduling orders.   Notably, some of the orders that were double-billed were straightforward orders concerning future filing dates or a notice of appearance by respondent's counsel.   This task does not take 0.1 hour to review nor does it require both an attorney and paralegal to complete.   There were duplicative billing entries for review of the same electronic notices and/or scheduling orders on February 22, 2010, April 1, 2010, June 14, 2010, January 7, 2011,[13] January 12, 2011, January 14, 2011, October 12, 2011, November 15, 2011, January 19,

---

[12] In 2018, Mr. Caldwell billed 12.3 hours on work relating to petitioners' motion for attorneys' fees and costs.   In 2019, Mr. Caldwell billed 19.8 hours on work relating to petitioners' reply to respondent's response to petitioners' motion for attorneys' fees and costs.

[13] A review of the docket does not show a scheduling order issued before January 7, 2011 that either Mr. Caldwell

2012, and January 23, 2012.   Moreover, there were duplicative billing entries for both attorney and paralegal attending the same telephone conference on May 25, 2011.   These duplicative billing entries result in a **further deduction of $211.50** of the total attorneys' fees award.

The undersigned finds the remaining billing entries for fees incurred up until June 5, 2012 and relating to petitioners' motion for attorneys' fees and costs reasonable.   Thus, the total amount of attorneys' fees is **reduced by $178,486.60** and **$65,350.50 is awarded**.

### c.   Reasonable Costs

As discussed, since reasonable basis for petitioners' claim was lost after they filed Dr. Miller's expert report on June 5, 2012, the undersigned will award only reasonable attorneys' costs up until June 5, 2012.   This results in a **deduction of $36,646.56** in attorneys' costs. The undersigned finds the remaining **$9,696.13** in attorneys' costs incurred up until June 5, 2012 reasonable.   Petitioners did not incur any personal costs.

## CONCLUSION

The undersigned finds petitioners had a reasonable basis to file a petition and this reasonable basis continued until petitioners filed the expert report from Dr. Miller on June 5, 2012.   Accordingly, the undersigned **GRANTS** petitioners' application for attorneys' fees and costs.   **The undersigned awards $75,046.63**, representing attorneys' fees and costs.   The award shall be in the form of a check made payable jointly to petitioners and Maglio Christopher & Toale, PA in the amount of **$75,046.63**.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[14]

**IT IS SO ORDERED.**

Dated: <u>April 19, 2019</u>                                    <u>/s/ Laura D. Millman</u>
                                                                  Laura D. Millman
                                                                  Special Master

---

or a paralegal had not previously reviewed.
[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.