# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 10-55V
Filed: January 30, 2020
PUBLISHED

| | |
|---|---|
| SHINGSHAN LIU and SUE WANG LIU as Personal Representatives of the Estate of DAN LIU,<br><br>　　　　　　　　　Petitioners,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>　　　　　　　　　Respondent. | Special Master Horner<br><br>Attorneys' Fees and Costs Decision; Reasonable Basis; Reasonable Hourly Rate; Excessive Billing; Expert Costs |

*Jennifer Anne Gore Maglio*, Maglio Christopher & Toale, PA, Sarasota, FL, for petitioners.
*Daniel Anthony Principato*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION ON REMAND AWARDING ATTORNEYS' FEES AND COSTS[1]

On October 28, 2019, the Court of Federal Claims granted petitioners' motion for review, vacated Special Master Millman's fee decision, and remanded this case to the Office of Special Masters "for consideration of Petitioners' motion for attorneys' fees and costs consistent with [the court's] opinion." *Liu v. Sec'y of Health & Human Servs.*, 145 Fed. Cl. 636 (2019). On October 29, 2019, this case was reassigned to my docket to address petitioners' motion for attorneys' fees and costs. (ECF No. 163.) For the reasons discussed below, I award petitioners $257,303.91 in final attorneys' fees and costs.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

## I. PROCEDURAL HISTORY

On January 27, 2010, petitioners filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10–34 (2012), alleging that the Menactra (meningococcal) vaccine administered to their son Dan Liu on May 30, 2008, caused an adverse reaction leading to his death on June 22, 2008.  Pet. at ¶ 11.  The petition that initiated this case did not characterize the cause of the decedent's death beyond alleging that it was causally related to his Menactra vaccination.  Instead, petitioners stated more broadly that they rely on the medical records with regard to the specifics of decedent's medical history.  Over the course of the case, petitioners in turn pursued their claim under separate theories based on two different injuries - cerebral edema and cardiac arrythmia.  During the more than eight years this case remained pending, petitioners filed 11 expert reports from five different experts.

Petitioners first filed an expert report by neuropathologist Douglas Miller, M.D., Ph.D.  (Ex. 14.)  He opined that the decedent died of cerebral edema from unknown catastrophic cause occurring minutes to hours before his death.  (*Id.* at 5.)  Petitioners then sought to further support their claim of vaccine injury by filing an expert report by immunologist Yehuda Shoenfeld, M.D.  (ECF No. 44.)  Dr. Shoenfeld provided an expert opinion concluding that the decedent experienced an immunological reaction during the three weeks post-vaccination that eventually caused the fatal cerebral edema.  After the filing of Dr. Shoenfeld's report, petitioners were tasked to factually support Dr. Shoenfeld's opinion that during the three weeks before the decedent's death, the decedent was experiencing observable symptoms of having an immunological reaction, such as fatigue, fever, lethargy, etc.  However, after significant investigation, petitioners determined that they could not reconcile Drs. Miller's and Shoenfeld's opinions and moved to strike Dr. Shoenfeld's opinion.  (ECF Nos. 69-71.)

Subsequently, petitioners retained cardiologist Robert Waugh, M.D., who opined that the decedent suffered eosinophilic myocarditis leading to a fatal cardiac event.  (Ex. 69.)  They retained immunologist Eric Gershwin, M.D., to further support their causal theory.  (Ex. 119.)  Unfortunately, Dr. Waugh was not able to continue with the case due to illness.  (ECF No. 117.)  Petitioner retained a second cardiologist, Frederick Yturralde, M.D.  (Ex. 128.)  Dr. Yturralde agreed that the decedent suffered myocarditis, but could not agree that it was eosinophilic.  (*Id.*)  Dr. Gershwin, however, continued to rely on the presence of eosinophils.  (Ex. 130, p. 1.)  On July 19, 2018, after Special Master Millman ordered petitioners to resolve the apparent conflict between Drs. Gerswin's and Yturralde's opinions, petitioners moved for dismissal, indicating that subsequent to an investigation of the facts and science supporting their case, petitioners were unable to prove that they were entitled to compensation.  (ECF Nos. 141, 143.)

On April 19, 2019, Special Master Millman issued a decision awarding partial attorneys' fees and costs, finding that reasonable basis was lost after petitioners filed their first expert report from Dr. Miller on June 5, 2012.  *Liu v. Sec'y of Health & Human*

*Servs.*, No. 10-55V, 2019 WL 2098165 (Fed. Cl. Spec. Mstr. July 19, 2018). Special Master Millman decided that "petitioners' claim was clearly undermined and no longer objectively feasible" once they filed Dr. Miller's report opining that petitioners' son died of brain swelling from an unknown catastrophic cause rather than cardiac arrythmia. *Id.* at *15. Petitioners subsequently filed a motion for review of Special Master Millman's decision. (ECF No. 157.)

Petitioners' motion was granted on October 28, 2019. (ECF No. 161.) The Court reasoned that:

> The Special Master impermissibly engaged in weighing the evidence presented on the merits, rather than deciding if Petitioners' claims were feasible. In this case, the Special Master's finding that all reasonable basis was lost after the filing of Dr. Miller's first report is not supported by the record and thus not in accordance with law. It may be, however, that further review of the record will yield a clearer understanding of the point where Petitioners' pursuit of this case may have lost its reasonable basis.

*Liu*, 145 Fed. Cl. at 641. Subsequently, this case was reassigned to my docket for the consideration of petitioners' motion for attorneys' fees and costs on remand. (ECF No. 162.)

## II. Motions to be Resolved

On October 30, 2018, petitioners filed a motion for attorneys' fees and costs, requesting $235,509.90 in attorneys' fees and $37,342.69 in attorneys' costs. (ECF No. 147.) On November 5, 2018, petitioners filed an amended motion for attorneys' fees and costs, requesting additionally $9,000.00 in expert costs from Dr. Yehuda Shoenfeld. (ECF No. 149.) Petitioners further supplemented their application for attorneys' fees and costs to request an additional $8,327.20 in attorneys' fees, reflective of work performed subsequent to filing petitioners' initial motion for attorneys' fees with the majority of time billed for preparing and filing a reply to respondent's response to their motion. (ECF No. 153-1.) Petitioners did not incur any personal costs in pursuing their claim. (ECF No. 147-4.) Thus, prior to their motion for review, petitioners originally requested $290,179.79 in total attorneys' fees and costs, representing $243,837.10 in attorneys' fees and $46,342.69 in attorneys' costs.

On December 18, 2019, petitioners filed a supplemental application for attorneys' fees and costs, encompassing the expenses incurred relating to petitioners' motion for review. (ECF No. 165.) Petitioners requested an additional $17,642.40 in attorneys' fees and $1,164.60 in attorneys' costs. Respondent filed a response to petitioners' supplemental motion on January 22, 2020. (ECF No. 167.) In his response, respondent noted that 13.6 hours of the time submitted with the supplemental motion was billed between July 9, 2018 and October 30, 2018. Respondent argued that these hours should have been included in petitioner's original fee application and should not

be recoverable now.[2] (ECF No. 167, pp. 4-5.) In reply, petitioners voluntarily reduced their supplemental fee request by the amount of these hours ($3,480.00) in order to avoid further litigation, reducing the total for the supplemental request to $15,327.00. (ECF No. 168, pp. 2, 4.)

Therefore, petitioners are now seeking a final award of $305,506.79 in attorneys' fees and costs, representing $257,999.50 in attorneys' fees and $47,507.29 in attorneys' costs. This matter is now ripe for consideration.

### III. DISCUSSION

#### A. Entitlement to Fees Under the Vaccine Act

Section 15(e)(1) of the Vaccine Act allows for the special master to award "reasonable attorneys' fees, and other costs." § 300aa–15(e)(1)(A)–(B). Petitioners are entitled to an award of reasonable attorneys' fees and costs if they receive compensation under the Vaccine Act, or, even if they are unsuccessful, if the special master finds that the petition was filed in good faith and with a reasonable basis. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1352 (Fed. Cir. 2008).

"Good faith" is a subjective standard. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). The standard for finding good faith has been described as "very low," and findings that a petition lacked good faith are rare. *Heath v. Sec'y of Health & Human Servs.*, No. 08-86V, 2011 WL 4433646, *2 (Fed Cl. Spec. Mstr. Aug. 25, 2011). In fact, it has been said that petitioners are entitled to a presumption of good faith absent direct evidence of bad faith. *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Here petitioners' good faith was not disputed.

In contrast, the question of whether a claim has a "reasonable basis" is objective, and must be affirmatively established by the petitioner. *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 305 (2011). The special master looks "not at the likelihood of success [of a claim] but more to the feasibility of the claim." *Turner*, 2007 WL 4410030, at *6 (citing *Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). The claim of a "reasonable basis" must be based on more than "unsupported speculation." *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994). The reasonable basis determination is "an objective inquiry unrelated to counsel's conduct." *Simmons*

---

[2] Respondent did also argue that "should the special master determine that petitioners had a reasonable basis at the time that they filed their claim, but that the claim lost reasonable basis during the course of the proceedings on entitlement, then there is no basis for an award of fees after the point that petitioner's claim lost reasonable basis." (ECF No. 167, p. 5.) Petitioner disputed that assertion. (ECF No. 168, pp. 2-4.) However, for the reasons discussed below, this argument is moot.

*v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 579, 582 (2016), *aff'd*, 875 F. 3d 632, 636 (Fed. Cir. 2017).  However, "[a] claim can lose its reasonable basis as the case progresses."  *R.K. v Sec'y of Health & Human Servs.*, 760 Fed. Appx. 1010, 1012 (Fed. Cir. 2019) (citing *Perreira*, 33 F.3d at 1376-77).

Upon my review of the entire record including the parties' briefs, and in conformance with the remanding Opinion, I find that petitioners had reasonable basis at the time they filed this claim, and thereafter maintained reasonable basis up to the point that they filed their motion to dismiss.

At the time of filing, petitioners' records provided a feasible platform for development of their ultimate claim.  The decedent's surgical pathology report, as part of his autopsy report, indicated that his "heart is slightly enlarged by weight and septal thickness. There is no histological evidence of hypertrophic cardiomyopathy, but an arrythmia secondary to cardiomegalic heart disease is in the differential." (Ex. 4, p. 9.) Although the decedent's initial death certificate listed "pending further studies" as the cause of death, it was amended to officially report that the decedent's cause of death was cardiac arrythmia of undetermined etiology.  (Ex. 4, p. 5; Ex. 7.)  The first responders from the Westfield Rescue Squad that arrived on scene marked "cardiac arrest/CPR" and "obvious death" in their report.  (Ex. 5.)  The final report from the paramedics that also arrived on scene indicated that the field diagnosis was cardiac arrest.  (Ex. 6.)  These records gave petitioners reasonable basis to pursue their claim that the Menactra vaccination caused cardiac arrythmia that led to death.  Specifically, petitioners ultimately pursued a theory that the decedent experienced myocarditis, which their experts opined can result in sudden death following signs and symptoms consistent with, *inter alia*, cardiac arrythmia.  (*See, e.g.,* Ex. 128, p. 2.)

Although the first expert report filed by petitioners from Dr. Miller gave the opinion that the decedent's cause of death was cerebral edema rather than cardiac arrythmia, Dr. Miller's report also noted that the decedent's heart was abnormally heavy and showed signs suggesting arrythmia.  (Ex. 14, p. 2.)  Additionally, Dr. Miller noted eosinophilic proteinaceous fluid in many airspaces in the decedent's lung section.  (*Id.* at 3.)  The presence of eosinophilic infiltrates was later discussed by Dr. Waugh in his expert opinion supporting petitioners' claim that the Menactra vaccination caused the decedent's cardiac event that caused his death. (Ex.69, p. 3.) And, in any event, one unfavorable expert report should not categorically preclude petitioners from seeking a favorable report elsewhere.  *See Ruppert v. Sec'y of Health & Human Servs.*, No. 13-869V, 2015 WL 8488942, at *2 (Fed. Cl. Spec. Mstr. Nov. 6, 2015).  Ultimately, in support of their cardiac-based theory of causation, petitioners filed three expert reports (Exs. 69, 70, 118) from Dr. Waugh, opining that the decedent showed signs of eosinophilic myocarditis, which led to his death.  They also filed three expert reports (Exs. 119, 126, 130) from Dr. Gershwin, opining that Menactra vaccination can cause eosinophilic myocarditis, and in the decedent's case, did cause his eosinophilic myocarditis and death.[3]

---

[3] However, as noted in the above procedural history, Dr. Waugh departed from the case before resolution and petitioners filed two expert reports (Exs. 128, 131) from a second cardiologist, Dr. Frederick

Respondent's opposition focuses mainly on the fact that this myocarditis theory was not the first pursued by petitioners. Respondent argues that this claim was not adequately investigated prior to filing and that pursuit of a second, ultimately failed theory, amounted to "a fishing expedition." (ECF No. 151, p. 16.) This criticism is well-supported by the prior history of this case. Following the filing of Dr. Miller's expert report, petitioners initially retained Dr. Shoenfeld to opine on the cause of the decedent's brain swelling, pulling focus to a brain-based theory of injury. Petitioners' investigation failed to support Dr. Shoenfeld's assertion and Dr. Miller wrote a clarifying supplemental expert report, confirming that, in his opinion, there was insufficient inflammation of the decedent's brain to support Dr. Shoenfeld's inflammation theory. In the end, petitioners moved to strike Dr. Shoenfeld's report, stating that petitioners could not rely on Dr. Shoenfeld's unsupported brain-based theory of vaccine injury, before moving on to later pursue their entirely unrelated theory of cardiac injury. (ECF No. 70.)

Despite this detour, however, petitioners had a reasonable basis to pursue the cardiac-based theory based on the records created around the time of their son's death and Dr. Waugh's and Dr. Gershwin's subsequent reports. Therefore, given the records and the subsequent expert reports, there was reasonable basis throughout the pendency of petitioners' case. The fact that petitioners alternatively pursued a separate, and likewise failed, theory in the interim, even if due to a lack of due diligence, does not deprive petitioners of reasonable basis for the case as a whole. Respondent's argument to the contrary is better addressed as an issue relating to the hours reasonably expended in this case.

### B. Reasonableness of Requested Attorneys' Fees and Costs

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera*, 515 F.3d at 1347. This is a two-step process. *Id.* at 1347-48. First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. *Avera*, 515 F.3d at 1348.

#### 1. Reasonable Attorneys' Fees

It is "well within the special master's discretion" to determine the reasonableness of fees. *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521-22 (Fed. Cir. 1993); *see also Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (1991) ("[T]he reviewing court must grant the special master wide latitude in determining the

---

Yturralde, who opined that the decedent had fulminant myocarditis, but also that the myocarditis was not eosinophilic. When Special Master Millman ordered petitioners to file a supplemental report from Dr. Gershwin resolving this apparent conflict, they moved to dismiss their claim. In their motion for review, petitioners indicated the dismissal was requested because they no longer wished to proceed, effectively sidestepping the question of whether Dr. Gershwin would have continued to support causation. (ECF No. 157-1, p. 9.)

reasonableness of both attorneys' fees and costs."). Applications for attorneys' fees must include contemporaneous and specific billing records that indicate the work performed and the number of hours spent on said work. *See Savin v. Sec'y of Health & Human Servs.*, 85 Fed. Cl. 313, 316-18 (2008). Such applications, however, should not include hours that are "'excessive, redundant, or otherwise unnecessary.'" *Saxton*, 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). Special masters can reduce a fee request *sua sponte*, without providing petitioners notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 729 (2011).

### i. Hourly Rates

A reasonable hourly rate is "the prevailing market rate defined as the rate prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Avera*, 515 F.3d at 1348 (citation and quotation omitted). In *Avera*, the Federal Circuit found that in Vaccine Act cases, the special master should use the rate prevailing in the forum, *i.e.*, Washington, D.C., in determining an award of attorneys' fees unless the bulk of the work is completed outside of the forum and there is a "very significant difference" between the forum hourly rate and the local hourly rate. 515 F.3d at 1349 (citing *Davis County Solid Waste Mgmt. & Energy Recovery Spec. Serv. Dist. v. U.S. Envtl. Prot. Agency,* 169 F.3d 755 (D.C. Cir. 1999)).

The decision in *McCulloch* provided a further framework for consideration of appropriate ranges for attorneys' fees based upon the experience of the practicing attorney. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motions for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). The Office of Special Masters has since updated the *McCulloch* rates, and the Attorneys' Forum Hourly Rate Fee Schedules for 2015-2016, 2017, 2018, and 2019 can be accessed online.[4]

Petitioners requested hourly rates for Mr. Caldwell at $391 for 2018, and $404 for 2019. However, consistent with prior decisions by other special masters, Mr. Caldwell's hourly rate will be reduced from $391 to $385 for 2018 and from $404 to $400 for 2019. *See Roetto v. Sec'y of Health & Human Servs.*, No. 16-0018V, 2018 WL 3031026, at *2 (Fed. Cl. Spec. Mstr. Mar. 29, 2018) (setting Mr. Caldwell's reasonable hourly rate for 2018 based on the Producer Price Index for the "Office of Lawyers"); *Kahn v. Sec'y of Health & Human Servs.*, No. 17-789V, 2019 WL 1805997, at *2 (Fed. Cl. Spec. Mstr. Mar. 4, 2019) (setting Mr. Caldwell's reasonable hourly rate for 2019 based on the Producer Price Index for the "Office of Lawyers"). I find these rates to be reasonable in

---

[4] Each of the Fee Schedules for 2015 through 2019 can be accessed at http://www.cofc.uscourts.gov/node/2914. The hourly rates contained within the schedules are derived from the decision in *McCulloch*, 2015 WL 5634323. The schedules for 2017, 2018, and 2019 are adjusted for inflation using the Producer Price Index for Offices of Lawyers ("PPI-OL").

light of Mr. Caldwell's experience and his performance in this case.[5] Upon review, the remainder of the hourly rates requested by all involved with this case are reasonable and consistent with what has been awarded in prior cases.

### ii. Hours Expended

Special masters may rely on their experience with the Vaccine Program to determine the reasonable number of hours expended. *Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 484 (1991), *rev'd on other grounds and aff'd in relevant part*, 988 F.2d 131 (Fed. Cir. 1993). It is "well within the special master's discretion to reduce the hours to a number that, in his experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1521. For example, special masters have previously reduced the fees paid to petitioners due to excessive and duplicative billing. *See Ericzon v. Sec'y of Health & Human Servs.*, No. 10-103V, 2016 WL 447770 (Fed. Cl. Spec. Mstr. Jan. 15, 2016) (reduced overall fee award by 10 percent due to excessive and duplicative billing); *Raymo v. Sec'y of Health & Human Servs.*, No. 11-654V, 2016 WL 7212323 (Fed. Cl. Spec. Mstr. Nov. 2, 2016) (reduced overall fee award by 20 percent), *mot. for rev. denied*, 129 Fed. Cl. 691 (2016). Furthermore, a special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 729 (2011).

1. Unnecessary Billing

After petitioners filed Dr. Shoenfeld's expert report, petitioners stated in a status conference that they needed additional time to find evidence to substantiate Dr. Shoenfeld's assertion that the decedent experienced three weeks of inflammation that led to his death. After multiple attempts and extensions of time to file additional supportive evidence, petitioners' counsel ultimately reported that petitioners cannot rely on Dr. Shoenfeld's expert report.[6] (ECF No. 68.) Mr. Caldwell spent more than two years trying to substantiate Dr. Shoenfeld's theory and correct the apparent conflicting opinions between petitioners' experts in this case, only to later file a motion to strike Dr. Shoenfeld's report. (ECF No. 70.) Attorneys are not entitled to compensation for performing work that is not necessary. *Riggins v. Sec'y of Health & Human Servs.*, No. 99-382V, 2009 WL 3319818, at *4 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd*, 406 Fed. Appx. 479 (2011) (citing *Hensley v. Echkerhart*, 461 U.S. 424, 434 (1983)). Additionally, petitioners are not given a "blank check to incur expenses." *Id.* (citing *Perreira*, 27 Fed. Cl. at 34).

---

[5] For 2018, Mr. Caldwell billed 54.1 hours at $391 per hour, totaling $21,153.10. (ECF No. 147-2, p. 24.) For 2019, Mr. Caldwell billed 19.8 hours at $404 per hour totaling $7,999.20. (ECF No. 153-1, p. 2.) With the adjusted rates, Mr. Caldwell's total billing for 2018 is $20,828.50 and $7,920 for 2019, resulting in a total difference of **$403.80**.

[6] To be clear, the suggestion that the decedent experienced three weeks of symptoms was included in the petition; however, it was not until Dr. Shoenfeld sought to rely on that unsupported allegation to assert the presence of inflammation that counsel sought to corroborate the account.

It was not reasonable for petitioners to engage in such a prolonged effort exploring a brain-based theory of vaccine injury in light of Dr. Miller's unsupportive opinion and Dr. Shoenfeld's unsubstantiated assertions. While Dr. Miller opined that the decedent experienced cerebral edema from an unknown catastrophic cause within minutes to two hours prior to his death (Ex. 14, p. 4), Special Master Millman explained that Dr. Shoenfeld later mischaracterized Dr. Miller's opinion as the culmination of three weeks of subclinical autoimmune inflammation (ECF No. 64). Special Master Millman observed that Dr. Shoenfeld relied on Dr. Miller's report to reach an opposite conclusion (ECF No. 64, p. 7) and this view was later confirmed by Dr. Miller's supplemental report (Ex. 65). Nonetheless, Mr. Caldwell conducted a fruitless investigation in pursuit of this theory that was not reasonable considering the record at the time, which a thorough review would have revealed. Notably, Special Master Millman expressed that Mr. Caldwell was inattentive to the details of petitioners' case, having filed conflicting expert opinions without properly addressing such issues. *Liu v. Sec'y of Health & Human Servs.*, No. 10-55V, 2019 WL 2098165, at *n.3 (Fed. Cl. Spec. Mstr. July 19, 2018). Her in-depth scheduling order detailing her review of both Dr. Miller's and Dr. Shoenfeld's reports, and her description of the inconsistencies between the two opinions compared to the record, further supports Special Master Millman's impression of the quality of work Mr. Caldwell provided in this case during this period. (ECF No. 64.)

From June 5, 2012 to July 8, 2014, the date Dr. Miller's first report was filed to the date petitioners moved to strike Dr. Shoenfeld's expert report as unreliable, Mr. Caldwell billed 123.6 hours, which amounts to $37,080.00. Based on Special Master Millman's observation that Mr. Caldwell was not fully informing himself of his case, and the excessive amount of time spent in determining a brain-based theory could not be pursued, I find a 75% reduction of the total amount billed during the indicated timeframe reasonable.[7] This results in a **reduction of $27,810.00** of the fees award.

2. Excessive and Duplicative Billing

Upon my review of the records, I also find that counsel included entries that are duplicative due to attorneys and paralegals billing for reviewing/receiving the same orders and medical records.[8] I also find that counsel included entries that are both

---

[7] It is not entirely possible to differentiate between the hours expended working specifically on petitioners' brain-based theory during this time period and hours that ultimately would have contributed to the final resolution of the case regardless. In any event, I am not required to conduct a line-by-line analysis in making reductions to a fee application. *See Broekelschen*, 102 Fed. Cl. at 729. Although from June 5, 2012 to July 8, 2014, there was time billed from both attorneys and paralegals, only hours billed from lead attorney, Mr. Caldwell, were calculated and ultimately reduced.

[8] For example, there were duplicative billing entries for reviewing the same orders or filings on May 13, 2010; June 14, 2010; July 14, 2010; November 16, 2010; January 12, 2011; January 13, 2011; March 31, 2011; November 15, 2011; January 23, 2012; July 23, 2012; February 6, 2013; November 12, 2013; February 26, 2014; March 17, 2014; May 4, 2015; March 4, 2016; June 1, 2016; October 21, 2016; October 24, 2016; November 8, 2016; March 8, 2017; March 29, 2017; April 14, 2017; August 22, 2017; November 30, 2107; April 2, 2018; July 24, 2018; May 14, 2019; May 20, 2019; and June 19, 2019. The

duplicative and excessive, where the attorney billed for "revise and execute" or "review and finalize" motion and a paralegal then billed for "review and finalize" the same motion.[9]  Additionally, a number of entries billed are for tasks that are vague and can be better characterized as clerical or administrative.  In the Vaccine Program, secretarial work should be considered as normal overhead office costs and therefore, billing for clerical and other secretarial work is not permitted.  *Mostovoy v. Sec'y of Health & Human Servs.*, No. 02-10V, 2016 WL 720969, at *5 (Fed. Cl. Spec. Mstr. Feb. 4, 2016) (citing *Rochester v. United States*, 18 Cl. Ct. 379, 387 (1989).  There was time billed for processing and preparing sending of binders and/or CDs to experts, processing correspondence to client file, and processing, reviewing, or approving medical literature by paralegals. [10]  Additionally, many such entries were followed by Mr. Caldwell reviewing the same medical literature, making such entries also duplicative and excessive.

Given the number of duplicative, excessive, vague, and clerical entries billed for this case, I will reduce the remaining overall requested fees amount, including the requested time billed in petitioners' supplemental motion, by five percent.  This results in a **deduction of $11,489.29**[11] from the final attorneys' fees award.

### 2. Attorneys' Costs

Attorneys' costs must be reasonable as well.  *See Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992) ("The conjunction 'and' conjoins both 'attorneys' fees' and 'other costs' and the word 'reasonable' necessarily modifies both.  Not only must any request for reimbursement of attorneys' fees be reasonable, so also must any request for reimbursement of costs.").  Reasonable costs include the costs of obtaining medical records and expert time incurred while working on a case.  *Fester v. Sec'y of Health & Human Servs.*, No. 10-243, 2013 WL 5367670, at *16 (Fec. Cl. Spec. Mstr. Aug. 27, 2013).  However, when petitioners fail to carry their burden, such as by not providing appropriate documentation to substantiate a requested cost, special

---

billing entries listed are merely examples and are not exhaustive; they provide a mere sampling of the numerous duplicative tasks billed by Mr. Caldwell, Ms. Maglio, and the Maglio firm paralegals.

[9] There were duplicative and excessive billing entries for reviewing and finalizing the same motions or filings on November 16, 2009; February 22, 2010; July 13, 2010; August 12, 2010; November 15, 2010; July 23, 2012; November 26, 2012; December 26, 2012; May 23, 2013; July 8, 2014; October 20, 2014; November 19, 2014; January 21, 2015; and August 21, 2017.  The billing entries listed are merely examples and are not exhaustive; they provide a mere sampling of the numerous duplicative and excessive tasks billed by Mr. Caldwell, Ms. Maglio, and the Maglio firm paralegals.

[10] There were clerical and duplicative billing entries for processing and reviewing medical literature on October 31, 2012; January 8, 2016; January 13, 2016; February 16, 2016; March 23, 2016; July 18, 2016; August 31, 2017; and June 8, 2018.  The billing entries listed are merely examples and are not exhaustive; they provide a mere sampling of the numerous duplicative and clerical tasks billed by Mr. Caldwell, Ms. Maglio, and the Maglio firm paralegals.

[11] The remaining overall requested fees, after adjusting Mr. Caldwell's 2018 and 2019 hourly rates and reducing the unnecessary hours from section B(a)(ii)(1), amounts to $229,785.70.  Five percent of $229,785.70 results to $11,489.29.

masters have refrained from awarding compensation. *See, e.g.*, *Gardner-Cook v. Sec'y of Health & Human Servs.*, No. 99-480V, 2005 WL 6122520, at *4 (Fed. Cl. Spec. Mstr. June 30, 2005).

### i. Expert Costs

Regarding expert fees, "[t]he question is not whether [the expert] expended the numbers of hours claimed, but whether it was necessary or reasonable for him to do so." *Baker v. Sec'y of Health & Human Servs.*, No. 99-653V, 2005 WL 6122529, at *4 (Fed. Cl. June 21, 2005) (quoting *Wasson v. Sec'y of Health & Human Servs.*, No. 90-208V,1991 WL 135015, at *3 (Fed. Cl. Spec. Mstr. July 5, 1991), *remanded*, 24. Cl. Ct. 482, 483 (1991), *aff'd*, 988 F.2d 131 (Fed. Cir. 1993)). "One test of the 'reasonableness' of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation would be willing to pay for such expenditure." *Hardy v. Sec'y of Health & Human Servs.*, No. 08-108V, 2016 WL 4729530 (Fed. Cl. Spec. Mstr. Aug. 16, 2016) (citing *Riggins v. Sec'y of Health & Human Servs.*, No. 99-382V, 2009 WL 3319819, at *3 (Fed. Cl. Spec. Mstr. June 15, 2009); *Sabella v. Sec'y of Health & Human Servs.*, No. 02-1627, 2008 WL 4426040, at *28 (Fed. Cl. Spec. Mstr. Aug. 29, 2008)). The Federal Circuit has ruled that "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Saxton*, 3 F.3d at 1521. Additionally, counsel have an obligation to monitor expert fees and costs. *Simon v. Sec'y of Health & Human Servs.*, No, 05-941V, 2008 WL 623833, at *2 (Fed. Cl. Spec. Mstr. Feb. 21, 2008).

In *Dingle*, the special master reduced the hourly rate and hours requested by petitioner for their experts based on their inadequate contributions to aid in resolution of petitioner's case. *Dingle v. Sec'y of Health & Human Servs.*, No. 08-579V, 2014 WL 630473 (Fed. Cl. Spec. Mstr. Jan. 24, 2014). Specifically, the special master reduced an expert's hourly rate and the number of hours requested because the expert presented several matters of concern in his testimony, suggesting that he was unprepared. *Id.* at *9. Additionally, the special master also reduced the requested hourly rate and number of hours for an expert that presented testimony that was detrimental to petitioner's case, further diminishing the expert's credibility and claimed specialized expertise. *Id.* at *6-9. In *Gruber*, the special master was justified in reducing the hourly rate and number of hours requested by Dr. Shoenfeld in light of the "relevant evidence in the record with respect to the level of work performed" on the case. *Gruber v. Sec'y of Health & Human Servs.*, 91 Fed. Cl. 773, 798 (2010). Specifically, the special master reviewed Dr. Shoenfeld's eight-page report that included standard recitation of his qualifications, references to medical literature that he co-authored and had referenced in many of his other cases in the Vaccine Program, and medical chronology drafted by petitioner's counsel. *Id.* at 796.

Here, the majority of literature Dr. Shoenfeld referenced were publications he co-authored, and the record was not extensive, as the decedent was relatively healthy before his death and Dr. Miller's preceding report did not cite any medical literature. Dr.

11

Shoenfeld's billing invoice indicated that he "review[ed] case materials (including research materials)" for 15 hours and "conduct[ed] medical research and prepar[ed] report" for seven hours. Especially in light of the final work product, where Dr. Shoenfeld failed to accurately address Dr. Miller's report, I find hours billed by Dr. Shoenfeld excessively high and unnecessary. *Heath v. Sec'y of Health & Human Servs.*, No. 08-86V, 2011 WL 4433646, at * 16 (Fed. Cl. Spec. Mstr. Aug. 25, 2011) (reducing reimbursement of expert costs based on the quality of the reports filed, the supporting documents, and the lack of detail in expert invoice).

Moreover, upon review of this case as a whole, I find that Dr. Shoenfeld did not sufficiently aid the resolution of this case. In fact, Dr. Shoenfeld arguably delayed the resolution of this case as a result of the fact that his report created conflict with petitioners' previously filed opinion by Dr. Miller as well as the evidence of record. Although it was reasonable to consult Dr. Shoenfeld, it was not reasonable to proceed with a full report without a further investigation of these apparent conflicts. Additionally, petitioners moved to strike Dr. Shoenfeld's report and explicitly indicated that they would not rely on it.[12] (ECF Nos. 68, 70). Even though that decision was made after a clarifying report from Dr. Miller, that conflict of opinion should have been evident to Dr. Shoenfeld and counsel at the time he initially reviewed this case and he should not have proceeded with drafting the full report.

Therefore, I will reduce Dr. Shoenfeld's billed hours from 22 hours to five hours, which is a reasonable amount of time to review the medical records filed in this case, review the medical literature that Dr. Shoenfeld is already familiar with, and determine whether an opinion could be provided. This results in a **deduction of $8,500** of the costs requested.

### ii. Remaining Costs

I have reviewed the billing records and supporting documentation, including the supplemental application that included additional attorneys' costs, and find no reason to make any further reductions. Therefore, I will award the remaining requested costs in full.

### IV. CONCLUSION

In light of the above, petitioners' second application for interim attorneys' fees and costs is **GRANTED** with reductions as follows:

---

[12] Also notable, in their reply brief in support of the initial motion for attorneys' fees and costs, petitioners listed all of the evidence that supported reasonable basis in this case. (ECF No. 153, p. 5.) They conspicuously did not include Dr. Shoenfeld's opinion.

| | |
|---|---|
| Attorneys' Fees Requested | $257,999.50 |
| (Reduction of Fees) | ($39,703.09)[13] |
| **Total Attorneys' Fees Awarded** | **$218,296.41** |
| | |
| Attorneys' Costs Requested | $47,507.50 |
| (Reduction of Costs) | ($8,500.00) |
| **Total Attorneys' Costs Awarded** | **$39,007.50** |
| | |
| **Totally Attorneys' Fees and Costs** | **$257,303.91** |

     Accordingly, petitioners are awarded **$257,303.91**, representing $218,296.41 in attorneys' fees and $39,007.50 in attorneys' costs, in the form of a check made payable jointly to petitioners and Maglio Christopher and Toale, PA.

     Pursuant to Vaccine Rule 28.1(a), the clerk of court is directed to notify the assigned judge of the filing of this decision on remand. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[14]

**IT IS SO ORDERED.**

                                                  **s/Daniel T. Horner**
                                                  Daniel T. Horner
                                                  Special Master

---

[13] The total reduction of attorneys' fees amounts to $39,703.09, representing $403.80 in adjustment of Mr. Caldwell's 2018 and 2019 hourly rates, $27,810.00 in unnecessary billing, and $11,489.29 in excessive and duplicative billing.

[14] Entry of judgment can be expedited by each party's filing of a notice renouncing the right to seek review. Vaccine Rule 11(a).